# Hays *v.* Colonial Trust Company, Appellant.

*Contract—Partnership—Sharing in profits—Equity.*

On a bill in equity it appeared that the plaintiff and defendant made an agreement in writing by which plaintiff was to take up options on certain stock at $10.00 a share. He was to be paid $100 a month, and in case he sold the stock at a price satisfactory to defendant he was to have twenty-five per cent of the profits. If, however, defendant determined to take up said options himself then defendant was to have a salary for his time, his investment was to be repaid with interest and then plaintiff was to have twenty-five per cent of the profits on the sale of the stock. Defendant was to have "full control" of the stock. *Held,* that the parties to the agreement were not partners, and that defendant although bound to good faith towards the plaintiff, was not bound to consult him as to the sale of the stock.

Argued Oct. 22, 1906. Appeal, No. 17, Oct. T., 1906, by defendant, from decree of C. P. No. 2, Allegheny Co., Oct. T., 1902, No. 314, on bill in equity in case of Milton D. Hays v. The Colonial Trust Company, Administrator of the Estate of W. C. Jutte, deceased. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Reversed.

Bill in equity for an account.

SHAFER, J., found the facts to be as follows:

On September 15, 1900, the plaintiff and defendant entered into an agreement in writing, by which it was provided that the plaintiff should take up options on the capital stock of the Pittsburg & Castle Shannon Railroad at $10.00 per share, and that if the defendant should determine to take up these options, the plaintiff was to have twenty-five per cent of the profits of the sale of the stock of the road, after the defendant

should receive the full amount of his money invested, with six per cent interest, "and a salary also for his time given to same," and that the defendant should have full control of the stock of the road. The plaintiff was also to have $100 per month and that the defendant might terminate the agreement at any time by giving ten days' notice in writing, which was done in February, 1901. The agreement contains other provisions which are not now in question.

The plaintiff had by this time procured from the owners of the stock options at $10.00 a share, and procured such options on 5,225 shares of the stock, and delivered them to the defendant, who exercised the rights therein granted and purchased the stock, and the shares were transferred to the defendant and other persons at his direction on the books of the company.

In March, 1901, the defendant pledged to the German National Bank as collateral security for a loan of $40,000, about 4,900 or 5,000 shares of this stock, and these shares were transferred partly to J. W. Friend and partly to F. N. Hoffstott, who were each officers of the national bank which made the loan.

A supplemental agreement was made between the parties in August, 1900, which recites that the defendant has purchased a majority of the stock of the railroad company, and is about to dispose of the same at a profit to John S. Scully of Pittsburg, and agrees that the profits of the sale so to be made shall be reinvested in a proposed railway company.

In August, 1901, the defendant being then the owner of the majority of the stock, purchased from Mr. Bailey the greater part of the remainder of the stock for $25.00 per share, and the stock was delivered to him in November, 1901.

In December, 1901, 2,446 shares of the stock were transferred on the books of the company to Mr. Hoffstott and 2,430 to Mr. Friend, these transfers being made on the books of the company for the purpose of electing directors at the next meeting of the railway company. In January of 1902, the bank called upon Jutte to pay the loan for which the stock was pledged, and he replied that he could not do so, and that he was willing to sell the stock at $12.00 per share, and this was done and the loan was cancelled by Mr. Friend and a

check for $20,000, being the difference between the price of 5,000 shares at $12.00 per share and the note, was sent to Mr. Jutte.

The testimony as to this sale was only that of Mr. Jutte, examined by the plaintiff as for cross-examination, and that of Mr. Friend, who was claimed to have taken part in the collusive sale, and other parties connected with the defendant. The conduct of Jutte in his negotiations with Mr. T. A. Noble, a proposition made by him shortly before the actual sale to Mr. Friend and some other matters, which appear in the evidence, together with the very contradictory and unsatisfactory account given by these parties of their transactions, undoubtedly throw grave suspicion upon the bona fides of the sale by Jutte. There is not enough, however, in the evidence to justify the court in finding that Jutte received, or was to receive, more than $12.00 per share for the stock, or that he was guilty of positive bad faith in selling at that price, and the exceptions relating to the bona fides of the sale are, therefore, dismissed.

On exceptions SHAFER, J., filed the following opinion :

We have carefully considered the exceptions of the plaintiff and the findings of fact upon which it was founded filed herein. The exceptions are numerous and cover almost every item of the account. The first exception is to the charge of proceeds of sale of 5,000 shares at $12.00 a share, the plaintiff's claim that the accountant should be charged with this stock at a much higher price. The other exceptions are to two items of credit claim, and are all dismissed, the items of credit being sufficiently discussed in the opinion heretofore filed.

The finding in regard to the charge for stock sold to which plaintiff excepts is, that there is not sufficient evidence to justify the court in finding that Jutte received or was to receive more than $12.00 per share for the stock, or that he was guilty of positive bad faith in selling at that price ; and the charge against Jutte of the stock sold at the rate of $12.00 per share only was thus put solely upon the ground that it did not positively appear that he in fact received a greater price than that for the stock. As suggested in the opinion filed the evidence in regard to the sale of the stock, all of which came from Jutte and the purchaser from him, was highly unsatisfactory. In

the first place the defendant stated the account of the number of shares sold by him and the price.at which they were sold as if from his books, in a way which could. hardly be correct, but which he stuck to in his testimony until it became evident that it could not be correct, when his counsel asked leave to amend his account. The statement of the account thus made was such as to show that nothing at all was coming to the plaintiff. It further appeared that upon negotiation for sale of the same stock six months before, he insisted upon the stock being put in along with other property at the price of $12.00 a share, and the other property put in at a price higher than was asked for it by the seller, so as to cover the difference between $25.00 a share and $12.00 a share. He afterwards bought other stock at $25.00 a share. When in the winter of 1902 the stock was actually sold for $12.00 a share to an officer of the bank who was practically in charge of the defendant's affairs, the transaction has a very artificial appearance, being carried on by correspondence in writing between the parties practically in the same office. Considering these circumstances and the numerous contradictions and inconsistencies in the testimony of the parties to the transaction, we cannot help seriously doubting its good faith and suspect very strongly that the sale was merely a pretended one for the purpose of depriving the plaintiff of his share of the proceeds of the purchase of the stock. We would not, however, feel justified in finding the fact to be so.

There is, however, another view of the case which we believe was not heretofore sufficiently considered. The defendant was as to this stock a partner with the plaintiff. It is true that the contract between them provided that the defendant should have " full control of the stock of said road," but that does not mean that he should sell when and as he pleased without consultation with the plaintiff or notice to him, and perhaps does not refer to the sale of it at all, nor does it mean that he should pledge it for his own individual debt. The duty of the defendant under the contract was to sell the stock, if he sold it all, in the usual way, upon the open market, and to procure for it the best price that could be had. What the defendant did, was to pledge it for his own debt, and thus to put the control of it more or less out of his own hands, and then with-

out notice to the plaintiff, who was entitled to receive one-fourth of the profits, without notice to the public, and without notice to or consultation with any of the several parties who had been negotiating for the stock from time to time and whose offers had been rejected, to sell it for less than one-half of what he had paid for similar stock not long before and less than one-half of what he had been offered for it not long before, to the officer in control of the bank which held it as collateral and in whose name one-half of it actually stood at the time upon the books of the company. And this sale was made of the whole of the 5,000 shares, although only two-thirds of the amount supposed to be received was required to pay the note for which it was pledged. It is true that no sales of the stock were made upon the open market by anyone before this transaction, but we have no hesitation in finding from the evidence that the stock was worth $25.00 a share at the time it was sold by the defendant at $12.00 a share. We think that the defendant having sold the stock under the circumstances above stated, is not in a position to complain that he is charged with the last price at which any of the stock was actually sold.

The exceptions to the findings as to the charge for the stock are, therefore, sustained to the extent above stated, and the account stated in opinion heretofore filed is to be modified by charging the defendant with 5,000 shares of stock at $25.00 per share, instead of $12.00 per share. This adds $65,000 to the debit side of the account and increases the same to be divided between the parties by that amount, making the same $69,206.46, instead of $4,206.46. Of this amount seventy-five per cent belongs to the defendant and twenty-five per cent, or $17,301.61, to the plaintiff, from which is to be deducted $911.86, leaving a balance in favor of the plaintiff of $16,389.75.

Let a decree be drawn that there is due from the defendant to the plaintiff the sum of $16,389.75 upon the account between them, which amount the defendant is ordered and directed to pay the plaintiff, and that the costs be paid, one-fourth by the plaintiff and three-fourths by the defendant.

*Error assigned* was the decree of the court.

*Samuel McClay*, of *Reed, Smith, Shaw & Beal*, for appellant.—W. C. Jutte had the right under the contract of Sep-

tember 15, 1900, to sell to. J. W. Friend this stock at such price as to him might seem proper, provided he exercised this discretion in good faith, and without fraud.

*S. S. Robertson*, for appellee.—It is the duty. of partners to observe the utmost good faith toward each other in all their transactions, since in all the scope of the partnership business they stand in a fiduciary relation, the one to the other ; and the same rules and tests are to be applied to the conduct of partners as are ordinarily applicable to that of trustees and agents : Bennett v. McMillin, 179 Pa. 146 ; Marsh's App., 69 Pa. 30 ; Smith v. Loring, 2 Ohio, 440 ; Coursin's App., 79 Pa. 220 ; .Lefever v. Underwood, 41 Pa. 505 ; Stidger v. Reynolds, 10 Ohio, 351 ; Devall v. Burbridge, 4 W. & S. 305 ; Inglis v. Floyd, 33 Mo. App. 565 ; Pomeroy's Eq., secs. 1070, 1088.

OPINION BY MR. CHIEF JUSTICE MITCHELL, February 4, 1907 :

In September, 1900, plaintiff and Jutte, appellant's decedent, made an agreement in writing by which plaintiff was to take up options on certain stock at $10.00 a share.  He was to be paid $100 a month, and in case he sold the stock at a price satisfactory to Jutte he was to have twenty-five per cent of the profits.  If, however, Jutte determined to take up said options himself then Jutte was to have a salary for his time, his investment was to be repaid with interest and then plaintiff was to have twenty-five per cent of the profits on the sale of the stock. Jutte was to have " full control " of the stock.

A subsequent agreement was made in August, 1901, relating to the investment of the profits in a proposed coal and railroad company, but not materially affecting the provisions of the first contract.

The learned judge below, though apparently after much doubt and hesitation, came to the opinion that the parties as to these transactions were partners and that Jutte was bound to consult or at least notify plaintiff, and " to sell the stock if he sold it at all, in the usual way upon the open market." We cannot however, concur in this construction of the agreement. It overlooks at least one attribute of partnership, the community of liability for losses.   The case belongs rather to that class where compensation may be measured by a proportion of

profits without making a partnership : Haines & Co.'s Estate, 176 Pa. 354.

Jutte was to be the owner of the stock throughout the transactions. The sales by plaintiff under the options he took were to be "at a profit satisfactory to" Jutte; no such provision as to the satisfaction of plaintiff was made as to sales by Jutte; the latter was "to have full control of the stock;" and he could terminate the agreement on ten days' notice in writing.

It is clear that Jutte was the owner, the principal, and plaintiff only an agent to purchase, and within limits to sell. He was, however, an agent with an interest in the proceeds of the sales which entitled him to an account and to the exhibition of good faith on the part of Jutte in getting the best price obtainable. For mistakes by which he missed sales at higher prices than he could subsequently obtain, or other errors of judgment Jutte was not liable, but he was bound to good faith towards plaintiff. At the first adjudication the learned judge below stated the account on these principles and found a balance due of only $139.51. But on the second adjudication upon exceptions filed to the first, he raised the amount to $16,389.75. The difference arises from the different views of a sale of a large block of the stock at $12.00 a share. This sale was attacked as fraudulent and collusive with the purpose of defrauding plaintiff. On this the court said, "Considering these circumstances and the numerous contradictions and inconsistencies in the testimony of the parties to the transaction, we cannot help seriously doubting its good faith and suspect very strongly that the sale was merely a pretended one for the purpose of depriving the plaintiff of his share of the proceeds of the purchase of the stock. We would not, however, feel justified in finding the fact to be so." He did, however, find that as there was a partnership the sale by Jutte was such a failure of duty to plaintiff as his partner as to make him liable for the price that the stock was actually worth and had been sold for within a comparatively short time.

But, as already said, there was no partnership; Jutte had three times the amount at stake in the profits that plaintiff had, and he not only had the right as owner to determine when and upon what terms he would sell, but the agreement shows that plaintiff trusted Jutte's judgment on that subject. The latter

can only be held liable for actual bad faith. This was the basis, moreover, on which plaintiff's bill was filed. The learned judge below having in his opinions on both hearings explicitly refused to find actual fraud, the decree cannot be sustained.

Decree reversed, and decree on first hearing reinstated with leave to appellee to file exceptions de novo.